126 F.3d 856
 Susan STEMLER, Plaintiff-Appellant,
v.
CITY OF FLORENCE; Bobby Joe Wince; Thomas Dusing; and
John Dolan, Defendants-Appellees.
William CHIPMAN, Administrator of the Estate of Conni Black,
Plaintiff-Appellant,
v.
CITY OF FLORENCE; Bobby Joe Wince; Thomas Kenner; John
Dolan; Ron Kenner, Boone County Sheriff; Rob
Reuthe; and Chris Alsip, Defendants-Appellees.
 Nos. 96-5993, 96-5996.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 1, 1997.
Decided Oct. 8, 1997.
Rehearing Denied Nov. 13, 1997.
 
 Eric C. Deters, Richard G. Meyer (argued and briefed), Deters, Benzinger & Lavelle, Covington, Kentucky, for Appellant.
 Jeffrey C. Mando (argued and briefed), Adams, Brooking, Stepner, Woltermann & Dusing, Covington, Kentucky, R. Kent Westberry, David Whalin (briefed), Landrum & Shouse, Louisville, Kentucky, Hugh O. Skees (briefed), Rouse, Skees, Wilson & Dillon, Florence, Kentucky, W. Kenneth Nevitt, R. Thaddeus Keal (briefed), Williams & Wagoner, Louisville, Kentucky, for Appellee.
 Before: MERRITT, WELLFORD, and BOGGS, Circuit Judges.
 BOGGS, J., delivered the opinion of the court, in which MERRITT, J., joined. WELLFORD, J. (pp. 875-876), delivered a separate concurring opinion.OPINION19
 BOGGS, Circuit Judge.
 
 
 1
 In No. 96-5996, the estate of Conni Black (hereinafter "Black") appeals the judgment entered against her on her substantive due process claim against officers of Boone County, Kentucky, and of the City of Florence arising from her death in a car accident on the night of February 18, 1994, shortly after those officers removed her from the car of Susan Stemler and placed her in the truck of her drunk and violently abusive boyfriend, Steve Kritis. In No. 96-5993, Stemler appeals the judgment entered against her on her claims of false arrest, malicious prosecution, and violation of equal protection arising from her arrest at that time for driving under the influence; she alleges that the officers arrested her solely because they believed her to be a lesbian. For the reasons explained herein, with respect to both plaintiffs, we affirm the district court's award of summary judgment to the City of Florence and to the Boone County defendants in their official capacities. However, we reverse the dismissal of Black's complaint against the individual officers, and we also reverse the dismissal of Stemler's complaint against the individual officers with respect to her equal protection claim.
 
 I. Background
 A. The Assaults and Car Chase
 
 2
 On February 18, 1994, at about 10:45 p.m., Conni Black and her boyfriend, Steve Kritis, arrived at Willie's Saloon in the Ramada Inn in Florence, Kentucky.[1] Both Black and Kritis had been drinking heavily. While line dancing, Black met Susan Stemler. Around 2:00 a.m., the two went to the women's restroom and discussed problems that each had with their respective boyfriends. During this conversation, Black told Stemler that she wanted to leave Kritis. According to one witness, Christine Stillwell:
 
 
 3
 Steve Kritis then burst into the restroom and slung the door to the restroom hard. He came into the restroom yelling. He stated in part: "If you don't get your fucking sister out of here, I'll kill the bitch." He yelled this at Laura Stemler.
 
 
 4
 He grabbed Conni Black on the arm as he screamed at her. He slammed her against a toilet stall. He then yanked her out of the restroom. After he left the restroom, I could still hear him screaming outside of the restroom.... Conni came back into the restroom. He yanked her out physically of the restroom a second time.
 
 
 5
 At this point, I wondered why nobody had called the police. When I went out of the restroom and into the lobby of the Ramada, I observed Kritis pushing Conni around in the parking lot. As I went outside into the parking lot, I observed Kritis still pushing Conni....
 
 
 6
 Kritis put his forehead against Conni's and put his hands behind his back. For every step Conni took to flee Kritis, Kritis took one forward still pressing his forehead against hers. He then made a fist to hit her. He looked at me and saw that I was watching and released his fist.
 
 
 7
 According to Stemler, after Kritis removed Black from the restroom, Kritis slammed Black against a concrete wall in the hotel lobby; Black's head hit the wall and she briefly passed out. Black asked Stemler to drive her home, and Stemler agreed. As they were leaving, Kritis struck Stemler in the back of the head with a blunt object. Stemler and Black got into Stemler's car and drove away at about 2:15 a.m. Kritis pursued them in his truck. Kritis did not have his headlights on. At one point during the chase, Kritis rear-ended Stemler's car with his truck in an attempt to make her car stop. A witness, Terry Barker, was driving east on U.S. 42 in Florence at the time; he saw that Kritis was chasing the women and that the women were in obvious distress, and decided to follow the vehicles.
 
 
 8
 According to Barker, at one point the truck got ahead of the car and forced it down Woodland Avenue, which ends in a cul-de-sac. Stemler pulled her car into a driveway, and Kritis stopped his car behind her to block her access to the street. Fortunately, the driveway belonged to William Minnick, a retired Florence police officer. His wife, Nancy Minnick, heard a horn blowing at about 2:30 a.m. When she opened her door, she saw Kritis standing in her driveway on the passenger side of the car. Kritis was hitting the car window and yelling. The car backed out around the truck and drove up the street. Kritis jumped in the car and again gave chase; according to Barker, he was driving at about sixty miles per hour on the sidewalk of the residential street. By this point, Mr. Minnick was awake and dressed; he called 911, and then got in his car and followed Kritis and Stemler. Barker also continued to follow them.
 
 B. The Police Stop
 
 9
 After the vehicles pulled back on to U.S. 42, they stopped at a light at Tanners Lane. Barker flashed his lights to alert a nearby police officer, defendant Lieutenant Thomas Dusing, an officer of the Florence Police Department, who was responding to the 911 call. When Dusing pulled up to Barker, Barker informed him that there was a "serious problem" with the two vehicles ahead of him, and that Kritis appeared to be a threat to the safety of the two women. After speaking with Barker, Dusing pulled his cruiser in front of Stemler's car and Kritis's truck at the intersection. As he left the cruiser, Stemler jumped out of her car and ran to him. Stemler told Dusing that Kritis was drunk, that he had assaulted both her and Black, that he had threatened to kill her, and that he had placed both of them in danger by chasing after them at high speed. She was obviously emotionally distraught, and cried while she related the evening's events to Dusing. While Dusing spoke with Stemler, four other officers arrived at the scene in separate cars: officers Bobby Joe Wince and John Dolan of the Florence Police Department, and officers Rob Reuthe and Chris Alsip of the Boone County Sheriff's Office. Each of the four would later be named as defendants in this litigation along with Dusing.
 
 
 10
 During Stemler's conversation with Dusing, Reuthe approached Kritis, who was seated in his truck. According to Reuthe's testimony, Kritis told him that Stemler was a lesbian,[2] and that she was kidnapping his girlfriend. After speaking with Stemler, Dusing approached Reuthe; Dusing would later testify that Reuthe told him at that time that Stemler was a lesbian. Reuthe also told Dusing that Kritis smelled of alcohol, but that he had not tested Kritis for intoxication. Dusing then approached Kritis, who repeated his assertion that Stemler was a lesbian. Kritis also asked Dusing to bring Black to his truck; Dusing told him that he would see what he could do. Dusing asked Kritis whether he had seen Stemler driving the car, and whether he would be willing to testify against Stemler.
 
 
 11
 Dusing would later submit a police report claiming that he did not smell alcohol on Kritis's breath at that time. This claim is contrary to his contemporaneous statements to Wince and to Mr. Minnick that Kritis smelled of alcohol. A blood test taken over two hours later would reveal that Kritis had a blood alcohol level of .115, which indicates that at the time of the police stop, his blood alcohol level was probably between .155 and .175, at least one-and-a-half times the legal limit in Kentucky of .10.[3] Subsequent observers would also testify that, over an hour after the police stop, it was immediately apparent that Kritis was very drunk. Nevertheless, neither Dusing nor any other officer ever tested Kritis for intoxication, or even asked him to step out of the truck.
 
 
 12
 At some point, Dusing asked Wince to test Stemler for intoxication. By that time, Wince had already heard Kritis's allegation that Stemler was a lesbian. Wince did not find any of the standard DUI indicators in examining Stemler; she did not have affected speech, impaired balance, impaired walking, or impaired coordination, and she did not seem disoriented. According to Wince, Stemler failed the horizontal nystagmus gaze field test, a test in which uncontrolled movement in a suspect's eyes may indicate drunkenness. However, Stemler alleges that Wince did not know how to perform that test properly, and had to ask for assistance with the test from Dolan. Stemler alleges further that Dolan also did not know how to perform the nystagmus test. Wince testified that the breathalyzer revealed a blood alcohol level of .105.[4] Stemler alleges that the breathalyzer was not properly calibrated.
 
 
 13
 After performing the field tests, Wince conferred with Dusing and Dolan. By this time, all three officers had heard Kritis's claim that Stemler was a lesbian. Dusing decided that they should arrest Stemler for driving under the influence, and the other officers agreed. Dusing would later concede that, in deciding to arrest Stemler and not Kritis, he relied on Kritis's version of events more than he did Stemler's. Wince approached Stemler, informed her that she was under arrest, and asked her who she would like to tow her car. Stemler broke into tears, pointed at Kritis, and asked Wince, "Aren't you going to check him? Why don't you check him?" As she was pointing, Wince grabbed her arm, pulled it behind her, and placed her in handcuffs.[5]
 
 
 14
 At approximately the same time, two unknown officers, one each from Florence and from Boone County, approached Barker, who was parked across the street. Barker related the complete story of the chase to both officers. Barker overheard one of the officers relating his story to a third officer. The officers asked him whether he saw Stemler driving the car, and whether he would be willing to testify against Stemler in court. Upon learning that Stemler was being placed under arrest, Barker told the officers that they were arresting the wrong person and that Kritis was obviously "crazy"; the officers didn't appreciate that, became "arrogant," and told him that he didn't "know what's going on" and that he could "go on about your business." Barker was dumbfounded and angered by the officers' actions. Barker confirms that the police never asked Kritis to leave the truck, despite the fact that, as during the chase, Kritis still had not turned his headlights on. Although the officers told Barker that they would contact him to be a witness against Stemler, they never did so. Furthermore, Wince failed to list Barker as a witness at the scene in his field notes, and the card on which the officers supposedly were writing down Barker's name and telephone number was lost.
 
 
 15
 While Wince was testing Stemler for intoxication, Mr. Minnick arrived at the scene. He spoke first with defendant Boone County Officer Chris Alsip. Alsip immediately "informed" him that Stemler was a lesbian. Minnick thought that it was odd that Alsip could state that fact with such certainty, given that Stemler had out-of-state license plates. Wince also made a point of informing Minnick that Stemler was a lesbian. Although the officers at the police stop were aware that Minnick had observed Kritis chasing Stemler, they asked him only whether they observed Stemler driving her car.
 
 
 16
 Dusing ordered Dolan to approach Black, who was still in the passenger seat of Stemler's car, and to inform her that she would be arrested for public intoxication "if she didn't want to leave with the male." At that time, Black was very intoxicated; her eyes were glassy and she slurred her words. Alsip and Dolan lifted her out of the car and assisted her to Kritis's truck. Black stumbled as she walked to the truck. Alsip physically placed her into the passenger seat in the truck. Alsip would later admit that he never heard Black say that she wanted to leave with Kritis.[6] Dusing told Alsip only that Stemler was a lesbian and that Kritis did not want his girlfriend with her; Alsip would later concede that, if he had known of all the preceding events that evening, he would not have placed Black in the truck but instead would have arrested Kritis.
 
 C. The Subsequent Accident
 
 17
 As soon as Black was in the truck, at about 3:00 a.m., Kritis drove away. Kritis drove two blocks from the police stop and then turned onto the northbound lanes of I-75. Black had passed out in the truck. According to Kritis, when she woke up, she "went haywire" and began hitting him; he hit her back and lost control of the truck. The truck swerved to the right and collided side-to-side with a guardrail. The impact threw Black partially out of the passenger side window. Black's arm was completely severed from her body and her head was severed into two parts. The truck was damaged and the front tire was blown. Kritis continued to drive slowly on I-75 and then east on I-275 until the truck could proceed no further.
 
 
 18
 A passing motorist, Kristopher Waldespuhl, was waved down by Kritis around 3:45 a.m. Kritis said, "my girlfriend is kind of hurt," and asked for help. According to Waldespuhl, Kritis spoke "very nonchalantly," and "had no emotions at all, wasn't upset." It was immediately obvious to Waldespuhl that Kritis was drunk; Kritis had alcohol on his breath, his eyes were glazed and bloodshot, and he was not acting sober. Kritis admitted to Waldespuhl that he was drunk. He also told Waldespuhl that "they were fighting at Willie's and some dyke bitch took her from me." Waldespuhl walked over to the other side of the truck. It was immediately apparent to Waldespuhl that Black was dead, although Kritis was unaware of this fact. Waldespuhl left to place a 911 call.
 
 
 19
 Officer Stephen Johnson of the Lakeside Park-Crestview Police Department arrived at the scene. It was obvious to Johnson that Kritis was drunk; he did not even need to conduct a field sobriety test to determine that he had probable cause to arrest Kritis. Another officer at the scene, Mike Mann, also immediately determined that Kritis was drunk. According to Mann, "Steve Kritis told me that he and his girlfriend were fighting and exchanging blows. He stated that he felt a large 'thud' but continued driving the truck. His truck started to quit and he pulled over." Johnson placed Kritis under arrest for driving under the influence at 4:30 a.m.[7]
 
 
 20
 An accident reconstruction specialist, Detective Jack Prindle, determined that, at the time of the impact with the guardrail, the truck was traveling at sixty-six miles per hour. The truck had traveled from the scene of the police stop to the scene of the accident in about five minutes. The accident occurred when the steering wheel turned abruptly to the right; there is no way to know what caused the wheel to turn. As the vehicle struck the guardrail, Black was partially ejected, causing her head and right arm to be severed on the guardrail. Kritis continued on for 2.5 miles before stopping.
 
 D. Stemler's Prosecution
 
 21
 After arresting Stemler, Wince took her for a blood test. Stemler claims that she had had only a half-glass of beer and two Irish coffees over the course of the night. She suspects that the officers tampered with her blood sample, which allegedly revealed a .17 blood alcohol level an hour after the breathalyzer allegedly revealed a .105 blood alcohol level. Wince handled her blood sample after he learned that Black had died. Larry Dehus, a "forensic scientist," reviewed the specimens and the timing of the tests and concluded that the sample's integrity had been destroyed, given that Wince waited five days to deliver the sample and that there were no procedures to guard against tampering. When a blood sample is submitted to the detective's office of the Florence Police Department, the clerk of that office, Mary Hayes, is supposed to receive a property card and an evidence tag; Hayes never received either with respect to Stemler's blood sample. This was a violation of department policy. Stemler's sample was the only sample that Wince had ever kept in the Florence Police Department refrigerator for five days in his career, and was also the only sample that he had ever personally driven to the lab. According to Officer Chester Snow, who supervised the property room, it would be "highly irregular" to keep a sample in the refrigerator for five days.
 
 
 22
 Stemler was prosecuted in the Boone County District Court for driving under the influence of alcohol. She defended the charge on the ground that the evidence against her had been fabricated. Dr. Gordon James testified at her trial that the handling of the blood sample was "arbitrary" and that the chain of custody had not been established. Her first trial resulted in a hung jury. She was retried. Although Wince claimed at Stemler's first DUI trial that he had not completed an evidence card, at the retrial he produced a completed card which neither Hayes nor Snow had ever seen. He claimed that he completed the card on February 19, at the time of the arrest; Hayes testified that if that were true, she should have seen the card. The second jury acquitted Stemler.
 
 E. Related State Court Proceedings
 
 23
 On March 7, 1994, Black's estate filed a wrongful death action under Kentucky law against each of the defendants in this case in the Boone County Circuit Court. Chipman v. Florence, No. 94-CI-00202. Stemler also brought suit against the defendants herein in the Boone County Circuit Court, raising state-law claims of malicious prosecution, false arrest, abuse of process, assault and battery, false imprisonment and negligent or intentional infliction of emotional distress. Stemler v. Florence, No. 94-CI-00459. The state court consolidated the two suits, and in separate orders on April 2 and April 26, 1996, it awarded the defendants summary judgment on all claims except Stemler's assault and battery claim against Wince. Stemler voluntarily dismissed that claim. Both Black and Stemler have appealed the judgments against them, and their appeals are pending in the Kentucky Court of Appeals.
 
 F. Proceedings Below
 
 24
 On March 31, 1994, William Chipman, the administrator of the estate of Conni Black, filed a complaint in the United States District Court for the Eastern District of Kentucky against Dusing, Dolan, Wince, Reuthe, and Alsip. The complaint also named the City of Florence and Ron Kenner, the Boone County Sheriff.[8] The complaint alleged that the defendants were liable under 42 U.S.C. § 1983 for Black's wrongful death, insofar as the defendants had displayed deliberate indifference in placing her in the car in which she was later killed. On August 2, 1994, the district court granted the individual officers' motions to dismiss under FED.R.CIV.P. 12(b)(6) on the ground of qualified immunity. Chipman v. City of Florence, 858 F.Supp. 87 (E.D.Ky.1994), reconsideration denied on amended complaint, 866 F.Supp. 332 (E.D.Ky.1994). On July 3, 1996, the district court granted the City of Florence's and Boone County's motions for summary judgment. Black now appeals, and her appeal is pending under docket number 96-5996.
 
 
 25
 On January 24, 1995, Susan Stemler filed a complaint under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Kentucky against Wince, Dusing, Dolan, and the City of Florence. The complaint alleged claims of excessive force, wrongful arrest, malicious prosecution, and violation of equal protection on the bases of sex and sexual orientation. On October 6, 1995, the district court granted the individual officers' motion to dismiss on grounds of qualified immunity. On July 3, 1996, after consolidating Stemler's case with Black's, the district court awarded summary judgment to the City of Florence. Stemler now appeals both orders, and her appeal is docketed in this court as No. 96-5993.
 
 
 26
 We have consolidated the two appeals for consideration. We will consider first both plaintiffs' claims against the municipal defendants, then Black's claims against the individual officers, and finally Stemler's claims against the individual officers.
 
 II. Municipal Liability Under § 1983
 
 27
 We may easily dispose of the claims against the City of Florence and Boone County. While a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees. See Monell v. Department of Soc. Servs. of the City of New York, 436 U.S. 658, 692, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978). Therefore, in order to state a claim against a city or a county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional "policy" or "custom" of the municipality. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986). The plaintiffs both assert that they were injured by the municipalities' allegedly deficient training programs. Where, as here, the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, ----, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997) (quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989)). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at ----, 117 S.Ct. at 1391. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." Id. at ----, 117 S.Ct. at 1393.
 
 
 28
 As noted above, in the present case, both Stemler and Black argue that the municipalities should be held liable as a result of their failure to train their officers adequately. Neither plaintiff has demonstrated that there is a genuine issue of material fact as to whether the training programs were adequate, or as to whether the city or the county acted with deliberate indifference to the risk of a constitutional violation. Officers of both the city and the county are required to attend the Basic Police Academy of the Kentucky Justice Cabinet Department of Criminal Justice Training. The academy is a 400-hour course in which officers are taught the elements of criminal offenses under Kentucky law, the definition of probable cause, and procedures for the handling of evidence. At the academy, officers are also taught how to ensure the safety of potential victims of domestic violence. In addition, both the city and the county require their officers to attend a forty-hour training class every year; this program also includes training as to the proper response to an allegation of domestic violence. Neither Stemler nor Black have identified any reason to believe that the training programs were inadequate in any way. Each argues only that the defendant officers lacked complete familiarity with their department's policy manuals; however, neither plaintiff asserts any reason to believe that the city or the county did not take proper steps to ensure that their officers knew and complied with their policies.
 
 
 29
 Furthermore, a plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond. See Brown, 520 U.S. at ----, 117 S.Ct. at 1390; Canton, 489 U.S. at 390-91, 109 S.Ct. at 1205-06. The plaintiffs are unable to identify any prior instances of misconduct in the Boone County Sheriff's Department. With respect to the City of Florence, they argue only that Wince had once had a sexual harassment complaint filed against him by a co-worker.[9] However, there is no indication that the city failed to respond appropriately to that complaint, or that because of that one complaint it should have been "plainly obvious" to the city that Wince would falsely arrest a woman solely on the basis of her perceived sexual orientation or force a woman against her will into the truck of a drunk and violently abusive man. Therefore, because the plaintiffs cannot show that either the city or the county acted with deliberate indifference to the risk of a constitutional tort, the award of summary judgment to the municipal defendants must be affirmed.
 
 III. Black's Substantive Due Process Claim
 A. Test for Qualified Immunity
 
 30
 We turn now to the merits of Black's claim against the individual officers. She alleges that the officers violated her right to "substantive due process"[10] under the Fourteenth Amendment by forcing her to leave the scene of the police stop in Kritis's truck. In other words, her claim is that the officers deprived her of her liberty (and, ultimately, her life) without due process of law by threatening to arrest her if she did not leave with Kritis, and by physically placing her against her will in his truck. Because Black seeks to hold the officers liable in their individual capacities under 42 U.S.C. § 1983, she must show not only that the officers' actions were unconstitutional, but also that they should have known at that time that they were violating her rights. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).
 
 
 31
 It is not necessary that the very action have been previously held unlawful but, given the preexisting law, the unlawfulness of the conduct must have been apparent. In determining whether an official is entitled to qualified immunity, this court asks whether the law was clearly established at the time of the alleged action.
 
 
 32
 Barton v. Norrod, 106 F.3d 1289, 1293 (6th Cir.1997) (citation omitted). In determining whether the officers should have known in February 1994 that their actions were unlawful, we look primarily to decisions of the Supreme Court, this court, and other courts within our circuit. See Cagle v. Gilley, 957 F.2d 1347, 1348 (6th Cir.1992).
 
 
 33
 We review the district court's determination that the officers were entitled to qualified immunity de novo. See Barton, 106 F.3d at 1293. In the present case, the district court reviewed the relevant case law dealing with claims that state actors violated substantive due process by allowing individuals to become subject to an indirect harm, and found much of that law to be confused and in conflict. It then appeared to reason that, since the doctrine of substantive due process was unclear in its entirety, no such claim could ever survive a motion to dismiss on the ground of qualified immunity: "This inquiry shows that the law in this area is unclear and that not only would no reasonable police officer have known what duty was owed to the plaintiff under the facts alleged in this case, but even the Supreme Court is uncertain on the matter." Chipman v. City of Florence, 858 F.Supp. 87, 90 (E.D.Ky.1994) (citing DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989)) (dismissing complaint); see also Chipman v. City of Florence, 866 F.Supp. 332, 335 (E.D.Ky.1994) (denying motion for reconsideration).
 
 
 34
 This was error. While, as we will see below, there is a good deal of uncertainty with regard to the precise contours of substantive due process, it does not follow that state actors are insulated from liability on all such claims, no matter what the underlying facts may be. The fact that the law may have been unclear, or even hotly disputed, at the margins does not afford state actors immunity from suit where their actions violate the heartland of the constitutional guarantee, as that guarantee was understood at the time of the violation.[11] Stated differently, it is simply irrelevant that the definition of the right to substantive due process has been in flux if, under any definition found in the case law at the time, the defendants should have known in February 1994 that their actions violated that right.
 
 
 35
 B. Custody Establishes the Existence of a Duty
 
 
 36
 We therefore proceed to determine whether the individual officers violated law that was clearly established in February 1994 when they forced Black into Kritis's truck. When, as here, a plaintiff alleges that state actors violated substantive due process by placing her at risk of harm from a third party, the court is presented with two distinct, though interrelated inquiries. First, in order to find for the plaintiff, the court must conclude that the plaintiff and the state actors had a sufficiently direct relationship such that the defendants owed her a duty not to subject her to danger. Second, the court must also conclude that the officers were sufficiently culpable to be liable under a substantive due process theory.
 
 
 37
 With respect to the first question, while the state does not owe its citizens a constitutional duty to keep them from harm in all circumstances, it has been clearly established that such a duty will arise when the state has acted to deprive an individual of certain indicia of liberty:
 
 
 38
 The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 
 
 39
 DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) (citation omitted); see also Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2457-58, 73 L.Ed.2d 28 (1982) (involuntarily committed mental patients have substantive due process right, analogous to Eighth Amendment right of prisoners, to protection from harm). In the present case, Black's complaint alleges--and the record evidence could reasonably be read to show--that the officers threatened to arrest her if she did not leave in Kritis's truck, and they physically lifted her out of Stemler's car and placed her in the truck against her will. In so doing, the officers took the "affirmative act of restraining [Black's] freedom to act on her [own] behalf," and consequently imposed upon themselves a duty to ensure that they were not placing her in danger. Their actions were, in the words of DeShaney, a restraint on Black's personal liberty, not a failure to act on her behalf. See also Collins v. City of Harker Heights, 503 U.S. 115, 127, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992).
 
 
 40
 The defendants rely on Foy v. City of Berea, 58 F.3d 227 (6th Cir.1995), to argue that they did not infringe Black's liberty. In Foy, the plaintiff had been drinking in a dormitory with his friends. After receiving a complaint, the police came to the dormitory and told them, "Get in your car and get out of here or somebody is getting arrested." Although the police had told them only to leave the premises, the plaintiff and his friends then decided to take a lengthy drive from Berea, Kentucky, to Crestline, Ohio. Forty-five minutes into that journey, the driver crashed the car, killing Foy. This court held that the defendant police officers had not violated Foy's right to substantive due process, since there was no restraint on his liberty that had caused him to keep driving. Id. at 230. The defendants also rely on Walton v. City of Southfield, 995 F.2d 1331 (6th Cir.1993). In Walton, we held that police officers who had arrested the driver of a car, and who had abandoned in a nearby building the children (ages 15 and 2) who were the passengers of that car--but who had never taken the children into their custody--were entitled to qualified immunity from a substantive due process challenge.
 
 
 41
 Neither case is apposite. In the present case, Black was rendered unable to protect herself by virtue of both the threat of arrest and her physical placement in the truck by the officers. Unlike Foy, Black never had the opportunity to make a voluntary choice to continue driving with Kritis beyond the span of time that the police had in effect ordered her to do so; her fatal accident occurred about five minutes after the truck left the police stop. Furthermore, unlike Walton, Black was in the custody of the defendant officers in the sense that they had affirmatively acted to deprive her of her liberty, rather than merely negligently refused to act to protect her. See Walton, 995 F.2d at 1336-37. In sum, neither Foy nor Walton did anything to alter the clear and simple rule that state actors owe a duty of care to those individuals of whom they deprive their liberty, and a reasonable jury could conclude that the officers had deprived Black of her liberty by placing her in the truck or by threatening her with an arrest that would have been unwarranted under Kentucky law. See Ky.Rev.Stat. § 222.202 (offense of public intoxication involves drinking in public or endangering one's self, other persons, or property).
 
 
 42
 While it is clear that the state owes a duty of care to an individual who has suffered a deprivation of liberty by the state--e.g., an individual who has been in the state's custody--there is also dicta in DeShaney that suggests that the state may also owe a duty to individuals in non-custodial settings:
 
 
 43
 While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.
 
 
 44
 489 U.S. at 201, 109 S.Ct. at 1006. A number of courts have relied on this language to hold that the state may owe an individual a duty of care under substantive due process, even if the individual is not in the state's custody, if the state has created a risk of harm to the individual. See Kneipp v. Tedder, 95 F.3d 1199, 1206-09 (3d Cir.1996) (collecting cases). Our court has suggested in dicta that DeShaney stands for the proposition that "a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger." Gazette v. City of Pontiac, 41 F.3d 1061, 1065 (6th Cir.1994). The defendants argue that this rule was not clearly established in February of 1994, and remains unclear today. We need not opine as to the circumstances under which a substantive due process claim in a non-custodial setting is possible, or as to whether that possibility had been clearly established in 1994. Under any definition of the term, Black was in the defendant officers' custody at the time she was forced into Kritis's truck. Because we, unlike the district court, believe that any uncertainty at the margins of the DeShaney test is not relevant to Black's claim, we hold that the defendants should have known under clearly established law that they owed Black a duty not to force her into harm's way.
 
 
 45
 C. The Defendants Violated Their Duty to Black by Exhibiting
 
 Deliberate Indifference to Her Fate
 
 46
 Our holding that the officers owed Black a duty of care does not end our inquiry, for we also must determine what duty of care they owed, and whether they breached that duty. Over the last decade, the Supreme Court and this court have gradually defined the level of culpability with which a state defendant must act in order to be held liable for a violation of substantive due process. In Daniels v. Williams, 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 666 n. 3, 88 L.Ed.2d 662(1986), the Supreme Court held that an allegation of simple negligence would not be sufficient to support a due process claim, but reserved judgment as to whether an allegation of gross negligence would suffice. In Nishiyama v. Dickson County, 814 F.2d 277 (6th Cir.1987) (en banc), this court answered that reserved question in the affirmative. In that case, the plaintiff had been killed by an inmate who stopped her by using a patrol car that he had been allowed to use by county officials despite repeated warnings. We held that the plaintiff had stated a substantive due process claim:
 
 
 47
 [T]he allegation in the present complaint of gross negligence on the part of the defendants was sufficient to charge them with arbitrary use of government power... .... [A] person may be said to act in such a way as to trigger a section 1983 claim if he intentionally does something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow.
 
 
 48
 Id. at 282.
 
 
 49
 This aspect of Nishiyama has since been further refined. In Lewellen v. Metropolitan Gov't of Nashville & Davidson County, 34 F.3d 345 (6th Cir.1994)--a case decided after the defendant officers forced Black into Kritis's car--we held that, with respect to non-custodial cases, Nishiyama was no longer an accurate statement of the law after DeShaney and Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In holding that a school board's negligence in building a school too close to a power line was not actionable under § 1983, we set forth a new test: "What seems to be required is an intentional infliction of injury ... or some other governmental action that is 'arbitrary in the constitutional sense.' " Lewellen, 34 F.3d at 351 (quoting Collins, 503 U.S. at 129, 112 S.Ct. at 1071); see also Gazette, 41 F.3d at 1067 (gross negligence is not actionable under substantive due process). We also expressed doubt as to whether even deliberate indifference by state actors could give rise to a substantive due process claim by a plaintiff who was not in the custody of the state. Lewellen, 34 F.3d at 350 n. 4.
 
 
 50
 Of course, the phrase "arbitrary in the constitutional sense" is not self-defining; indeed, in Collins, the only elucidation that the Supreme Court provided for that phrase was a reference to the old chestnut of substantive due process claims, "conscience shocking." 503 U.S. at 128, 112 S.Ct. at 1070. The defendants' argument is essentially that Black's claim fails the test of Lewellen and Collins because there is no law now, nor was there in 1994, clearly specifying any area of liability under substantive due process. In essence, they argue that there is no clearly established law holding that they have any duty to persons in their custody. As they conceded at oral argument, under their theory, they would not be liable even if they physically carried Black to the middle of a busy highway and left her there. However, Collins carefully noted that its holding was limited to those cases where a plaintiff was not in the custody of the state, and specifically reaffirmed the established law that the state is required to take care to protect persons in its custody from danger. See Collins, 503 U.S. at 127, 112 S.Ct. at 1069; see also Lewellen, 34 F.3d at 350 n. 4. Since, as we have held above, viewing the facts in her favor, Black was in the defendants' custody at the time that they forced her into Kritis's truck, they owed her a duty not to endanger her safety.
 
 
 51
 In cases such as this one, where the plaintiff suffered injury as a result of being placed in the state's custody, it has consistently and uncontroversially been the rule that a constitutional claim arises where the injury occurred as a result of the state's deliberate indifference to the risk of such an injury. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994); Wilson v. Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 2326-27, 115 L.Ed.2d 271 (1991); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Although each of these cases involved an Eighth Amendment claim raised by a prisoner, we have consistently held that at least the same standard applies to substantive due process claims raised by other persons in the custody of the state. See Durham v. Nu'Man, 97 F.3d 862, 869 (6th Cir.1996) (patient at state mental hospital), cert. denied, --- U.S. ----, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997); Lintz v. Skipski, 25 F.3d 304, 306 (6th Cir.1994) (children in state foster home); Heflin v. Stewart County, 958 F.2d 709, 713-14 (6th Cir.1992) (pretrial detainee); Meador v. Cabinet of Human Resources, 902 F.2d 474, 476 (6th Cir.1990) (children in state foster home). While Lewellen may have declared that the range of culpable conduct is narrower in cases where the plaintiff is not in the state's custody, it did nothing to change the standard of deliberate indifference in cases involving a custodial relationship. See Foy, 58 F.3d at 232 (noting distinction). In cases in which a plaintiff alleges an injury arising out of the state's custody over her, the deliberate indifference test ensures that injuries arising out of truly arbitrary governmental action are compensated, while at the same time avoiding the imposition on to the states of a broad, federalized system of tort law. We therefore re-affirm the application of that test today.
 
 
 52
 We again note that the district court erred in holding that the entire field of substantive due process law regarding state liability for indirect injury was not clearly established in 1994. See Chipman, 858 F.Supp. at 90. Although the discussion above reveals that there is obviously considerable uncertainty at the margin, the core principle that the state must not act with deliberate indifference to the risk of injury to persons in its custody is well-established. In the present case, we believe that Black's complaint, as well as the record evidence read in the light most favorable to her, supports a claim that the defendant officers acted with deliberate indifference to the threat of injury to her. They knew, or reasonably should have known, that Kritis was unfit to drive. They knew, or reasonably should have known, that Kritis had assaulted her earlier in the evening and had threatened to hurt her. Nevertheless, they chose to act affirmatively to place her in harm's way.
 
 
 53
 The very notion that police officers should not have known that they could not force an incapacitated woman to drive off with an obviously drunk man who they had reason to believe had beaten her betrays a chilling and unacceptable vision of the role of the police in our society. In short, these facts support a substantive due process claim under law that was clearly established in 1994, and we are therefore obliged to reverse the dismissal of her complaint against the individual officers.[12]
 
 
 54
 IV. Stemler's Claims against the Individual Officers
 
 
 55
 We turn now to the merits of Stemler's claims against the individual officers. She has raised claims of false arrest and malicious prosecution against the officers. She also asserts that her arrest violated the Equal Protection Clause insofar as it was based either on her sex or on her supposed sexual orientation. We again review the law to determine whether the officers should have known in February 1994 that their actions were in violation of applicable federal constitutional or statutory guarantees.
 
 A. False Arrest and Malicious Prosecution
 
 56
 As noted above, Stemler brought a suit against the defendants herein in the Boone County Circuit Court alleging various state-law theories. The state court awarded summary judgment to the defendants on April 2, 1996. The state court described the facts in relevant part as follows:
 
 
 57
 Upon speaking to Stemler, Officer Wince noted the odor of alcohol, conducted field sobriety tests, administered a PBT test (which read .105), and obtained an admission from Stemler that she had consumed alcoholic beverages. Based upon the above, Officer Wince decided to arrest Stemler for DUI.
 
 
 58
 Stemler v. City of Florence, No. 94-CI-00459, slip op. at 2 (Boone Co., Ky., Cir. Ct. Apr. 2, 1996) (consolidated with Chipman ). The court reasoned that the evidence established that there was probable cause to arrest her:
 
 
 59
 There are no genuinely disputed material facts relating to the question of probable cause for the arrest of the Plaintiff, Stemler. Stemler stated at the scene that she had consumed alcohol, she had the smell of alcohol on her person, her performance on the field sobriety tests and her preliminary breath test result of .105 certainly constitutes [sic] probable cause.
 
 
 60
 Id. at 5. The state court then held that the existence of probable cause precluded both the false arrest claim and the malicious prosecution claim under Kentucky law.
 
 
 61
 Stemler is precluded from relitigating in this case the issue of whether there was probable cause to arrest her to the same extent that Kentucky would accord preclusive effect to the judgment against her in her state court civil suit. See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 82, 104 S.Ct. 892, 896-97, 79 L.Ed.2d 56 (1984); Allen v. McCurry, 449 U.S. 90, 97, 101 S.Ct. 411, 416, 66 L.Ed.2d 308 (1980).[13] Under Kentucky law, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Revenue Cabinet v. Samani, 757 S.W.2d 199, 202 (Ky.Ct.App.1988) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1980)). The issue of probable cause for Stemler's arrest was actually litigated and decided in the state court suit, and was necessary to the disposition of the case. Although Stemler's appeal is pending in that case, the pendency of an appeal does not destroy the finality of the judgment for the purposes of issue preclusion under Kentucky law. See Roberts v. Wilcox, 805 S.W.2d 152, 153 (Ky.Ct.App.1991). Thus, this court is bound by the state court's determination that there was probable cause for Stemler's arrest.
 
 
 62
 The existence of probable cause for Stemler's arrest forecloses her false arrest claim. A plaintiff bringing a constitutional claim of false arrest under the Fourth Amendment must show that there was not probable cause for the arrest. See Donovan v. Thames, 105 F.3d 291, 298 (6th Cir.1997) (applying Kentucky doctrine of collateral estoppel).[14] Likewise, the existence of probable cause would negate the possibility of liability under a state-law malicious prosecution theory, and therefore under a federal constitutional theory as well, at least to the extent that Stemler alleges that the defendants sought to prosecute her despite knowing that there was not probable cause to do so. See Baker v. McCollan, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); Coogan v. City of Wixom, 820 F.2d 170, 175 (6th Cir.1987).
 
 
 63
 Stemler, however, is not now asserting that sort of a malicious prosecution claim. Instead, she asserts that even if there were probable cause to prosecute her, Wince committed a constitutional tort by falsifying evidence against her. Under law that was clearly established in 1994, Wince would have violated Stemler's right to due process if he knowingly fabricated evidence against her, and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury. See United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir.1989); see also Riley v. City of Montgomery, 104 F.3d 1247, 1253 (11th Cir.1997); United States v. Epley, 52 F.3d 571, 576 (6th Cir.1995); Grillo v. Coughlin, 31 F.3d 53, 56 (2d Cir.1994). A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant. The state court only found that there was probable cause to prosecute Stemler, and made no findings with regard to any claim of fabrication of evidence. Thus, since the state court in the civil suit made no findings on this issue, and the court in the state criminal case did not make any findings on this issue that were necessary to the final judgment (i.e., Stemler's acquittal), she would not be estopped from pursuing this claim.
 
 
 64
 B. Failure to Plead an Evidence-Tampering Theory
 
 
 65
 However, Stemler did not allege this alternative theory in her complaint. The closest she comes to making such an allegation is at paragraph 48 of her amended complaint: "The Defendants, Officers Wince, Dolan, Dusing and City of Florence, instituted and continued the original criminal judicial proceeding against the Plaintiff by insisting upon her prosecution and conviction despite their personal knowledge Plaintiff should not be so prosecuted." This allegation cannot fairly be read to give notice that she seeks to assert an evidence-tampering claim. The record reflects that the evidence-tampering claim first arose on May 7, 1996, in Stemler's response to the city's motion for summary judgment, after the individual officers were dismissed from the suit.
 
 
 66
 It is well-settled that the parties may constructively amend the complaint by agreeing, even implicitly, to litigate fully an issue not raised in the original pleadings. See 6A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1493 at 19 (2d ed.1990). However, such a constructive amendment can have no effect upon a party who has been dismissed from the action, and who is not given notice that a new claim of liability has been asserted against him. Stemler, of course, was free to seek leave to amend her complaint again to raise her new theory of falsification of evidence, or to file a new complaint against Wince explicitly raising that claim. She did not do so. The district court did not err in dismissing Stemler's complaint by failing to consider a cause of action that she had not yet alleged. Consequently, this court is powerless to engage in any further review of her allegation that Wince falsified evidence against her in her criminal trial.
 
 C. Equal Protection
 
 67
 The defendants also assert that Stemler is collaterally estopped from pursuing her equal protection claims. However, the determination of probable cause does not preclude a plaintiff from pursuing a claim that the state chose to prosecute her due to invidious discrimination. The courts have long held that a selective enforcement claim may be available even where there is probable cause for prosecution. See Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985); Oyler v. Boles, 368 U.S. 448, 455-56, 82 S.Ct. 501, 505-06, 7 L.Ed.2d 446 (1962). While we have held that the possibility of a discriminatory motive does not affect the inquiry into the objective reasonableness of an arrest for the purposes of the Fourth Amendment, see United States v. Ferguson, 8 F.3d 385, 391 (6th Cir.1993) (en banc), that case did nothing to question the long-established availability of a separate selective enforcement claim under the Equal Protection Clause. The Supreme Court subsequently confirmed our interpretation of the Fourth Amendment, and at the same time even more explicitly re-confirmed the availability of an equal protection claim despite the existence of probable cause:
 
 
 68
 We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.
 
 
 69
 Whren v. United States, 517 U.S. 806, ----, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). Stemler is not collaterally estopped, and we therefore proceed to the merits of Stemler's equal protection claims.
 
 
 70
 In order to state a claim of selective prosecution, a plaintiff must demonstrate three elements:
 
 
 71
 First, [the state actor] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.
 
 
 72
 United States v. Anderson, 923 F.2d 450, 453 (6th Cir.1991) (citing Wayte, 470 U.S. at 608 n. 10 & 609, 105 S.Ct. at 1531 n. 10). With regard to the first element, it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside her category were not prosecuted. See United States v. Armstrong, 517 U.S. 456, ----, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996). Furthermore, there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; "the standard is a demanding one." Id. at ----, 116 S.Ct. at 1486.
 
 
 73
 We believe that this is the rare case in which a plaintiff has successfully stated a claim of selective prosecution. Stemler's complaint adequately alleges, and the record evidence supports a finding, that the defendant officers chose to arrest and prosecute her for driving under the influence because they perceived her to be a lesbian, and out of a desire to effectuate an animus against homosexuals. Each of the defendants was aware of Kritis's assertion that Stemler was a lesbian, and Dusing admitted that he relied on Kritis's version of the facts in deciding to arrest Stemler. Furthermore, the record supports a finding that Kritis was similarly situated to Stemler (or, indeed, far drunker than she), that the defendant officers perceived Kritis to be heterosexual, and that consequently they chose not to arrest him at the same time that they arrested Stemler.
 
 
 74
 The defendants concede that Stemler's complaint alleges, and the record evidence could support a finding, that they decided to arrest and prosecute her because they perceived her to be a lesbian. They do not attempt to assert any justification whatsoever for this decision; instead they argue that as a blanket matter it is always constitutional to discriminate on the basis of sexual orientation, citing Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). However, Bowers held only that there is no substantive due process right to engage in homosexual sodomy, and expressly declined to consider an equal protection claim. 478 U.S. at 196 n. 8, 106 S.Ct. at 2847 n. 8. It is inconceivable that Bowers stands for the proposition that the state may discriminate against individuals on the basis of their sexual orientation solely out of animus to that orientation: " 'If the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.' " Romer v. Evans, 517 U.S. 620, ----, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (quoting United States Dep't of Agric. v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)) (internal quotation and ellipses omitted). Stated differently, since governmental action "must bear a rational relationship to a legitimate governmental purpose," Romer, 517 U.S. at ----, 116 S.Ct. at 1629, and the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, a state action based on that animus alone violates the Equal Protection Clause.
 
 
 75
 While this case, and Romer, involved animus related to sexual orientation, the principle involved in our case really has nothing to do with that controversial area. Moreno, the case quoted in Romer, above, involved commune residents; the principle would be the same if Stemler had been arrested discriminatorily based on her hair color, her college bumper sticker (perhaps supporting an out-of-state rival) or her affiliation with a disfavored sorority or company.
 
 
 76
 It may be objected that Romer was not decided until after the defendants arrested and sought to prosecute Stemler allegedly for the sole reason of animus against her perceived sexual orientation. But it didn't take Romer to tell us that such arbitrary state action is contrary to the principle of equal protection of the laws.[15] It is a venerable rule under the Equal Protection Clause that the state may not choose to enforce even facially neutral laws differently against different portions of the citizenry solely out of an arbitrary desire to discriminate against one group. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 373, 6 S.Ct. 1064, 1072-73, 30 L.Ed. 220 (1886).
 
 
 77
 Furthermore, while a plaintiff in a selective-prosecution case must demonstrate that she was prosecuted because she was the member of some group, and not merely because the state actor prosecuted her out of purely personal animosity, see Futernick v. Sumpter Twp., 78 F.3d 1051, 1057 (6th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 296, 136 L.Ed.2d 215 (1996), the availability of such a claim has never been limited only to those groups accorded heightened scrutiny under equal protection jurisprudence. See id. at 1056. Instead, a plaintiff makes out a selective-enforcement claim if she shows that the state based its enforcement decision on an "arbitrary classification," Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), that is to say, a classification that gives rise to an inference that the state "intended to accomplish some forbidden aim" against that group through selective application of the laws. Futernick, 78 F.3d at 1056. A selective-enforcement claim such as this one is thus conceptually different from a claim that a statute violates equal protection; while almost every statute can be shown to have some conceivable rational basis, thereby surviving an equal protection challenge unless it is shown to discriminate against a group accorded heightened scrutiny, it will often be difficult to find a rational basis for a truly discriminatory application of a neutral law.
 
 
 78
 It is beyond cavil that Stemler has adequately alleged a selective-enforcement claim here. The record supports a finding that she was perceived to be a member of "an identifiable group," and that defendants sought to implement their animus against that group by arresting and seeking to prosecute her. The defendant officers are unable, and indeed have not even attempted, to demonstrate that there is any conceivable rational basis for a decision to enforce the drunk-driving laws against homosexuals but not against heterosexuals. The defendants can rely only on their assertion that discrimination on the basis of sexual orientation should be accorded no scrutiny whatsoever. We emphatically reject this assertion; the proposition that the state may constitutionally discriminate by enforcing laws only against homosexuals (or Centre College graduates or SAE members) is not now, and never has been, the law. Under the facts as we are obligated to construe them, the defendants violated the core principle of the Equal Protection Clause by choosing to exercise the power of the state against Stemler solely for the reason that they disapproved of her perceived sexual orientation. Thus, the dismissal of her complaint must be reversed.
 
 V. Conclusion
 
 79
 With respect to both plaintiffs, the district court's award of summary judgment to the municipal defendants and to the defendants in their official capacities is AFFIRMED. In No. 96-5996, the dismissal of Black's complaint against the individual officers is REVERSED. In No. 96-5993, the dismissal of Stemler's complaint against the individual officers is REVERSED with respect to her claim of denial of equal protection on the basis of sexual orientation; in all other respects, the judgment of the district court is AFFIRMED. Both cases are REMANDED to the district court for further proceedings consistent with this opinion.
 
 CONCURRENCE
 
 80
 HARRY W. WELLFORD, Circuit Judge, concurring.
 
 
 81
 I concur in part II dealing with a conclusion of no municipal liability and propriety of summary judgment for the City and the County in this case. As to part I, I do not necessarily subscribe to all of the findings made, particularly as to subparts B and D. I do not think it necessary to go into the detail recited by Judge Boggs to rule on the orders granting qualified immunity to the individual defendants.
 
 
 82
 I also concur in parts IV.A and IV.B that "probable cause for Stemler's arrest forecloses her false arrest claim" and that "probable cause would negate the possibility of liability under a state-law malicious prosecution theory," or a false arrest claim. Also, I concur in the conclusion that Stemler may not pursue further a claim that defendant Wince falsified evidence against her in her state criminal trial.
 
 
 83
 As to part III, the claim on behalf of the deceased Conni Black, I believe that the alleged conduct of the individual police officers supports reversal of their motions to dismiss. I do have reservations about concluding that deliberate indifference may have been averred as a matter of constitutional law, but I would agree with Judge Boggs to the extent he maintains that "the defendants should have known in February of 1994 that their [alleged] actions violated [Black's constitutional] right."
 
 
 84
 I would not cite Nishiyama v. Dickson County, 814 F.2d 277 (6th Cir.1987) (en banc), as persuasive authority in this case. The individual defendants in that case had no direct relationship of any kind with the victim. Furthermore, I am doubtful about the continuing authority of Nishiyama, and I consider it settled in the Sixth Circuit that gross negligence alone may not subject a police officer to § 1983 liability absent a showing of willful disposition to harm or to deliberately ignore the plight of the victim in custody. Lewellen v. Metropolitan Gov't of Nashville & Davidson County, 34 F.3d 345, 351 (6th Cir.1994).
 
 
 85
 Lewellen also holds that liability of a state actor may arise from some "action that is 'arbitrary in the constitutional sense.' " This is a higher standard than gross negligence. Lewellen requires some designed and intentional activity on the part of the state actor to harm or punish someone. Id. And in this case, there was a sufficient allegation of arbitrary conduct on the part of some defendants intentionally designed to injure or punish Conni Black. I would hold simply that Black's estate has alleged sufficient facts to survive a motion to dismiss and that we should therefore reverse the contrary holding of the district court and remand for further consideration of the existence and proof of a constitutional tort. To put it another way, the alleged conduct of certain individual defendants may have been sufficiently shocking to the conscience that the Black claim should not have been dismissed against those defendants. See Collins v. City of Harker Heights, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). I am, however, particularly reluctant to expand upon the "highly elastic notion of substantive due process." Lewellen, 34 F.3d at 351.
 
 
 86
 I wholeheartedly agree with Judge Boggs' conclusion that "under any definition of the term, Black was in the defendant officer's custody at the time she was forced into Kritis' truck." The district court erred, in my view, in holding that Black, "who was very intoxicated ... was not taken into custody in the ordinary sense." I believe there is adequate averment and showing that Black was effectually taken into custody. The district court therefore erred, I believe, in granting motions to dismiss as to the individual defendants.
 
 
 87
 I next address part IV.C, Stemler's remaining claims against the individual officers based upon an alleged equal protection violation, which Judge Boggs characterizes as alleged selective prosecution. I cannot equate an alleged animus against Stemler because of a perception about her sexual proclivities with discrimination based upon race, sex, national origin, or the like.[1] There may be enough basis in Stemler's claim that some individual defendants based their law enforcement actions on some arbitrary and capricious classification or selectively enforced the laws on drunken driving, public intoxication, or public endangerment to warrant our reversing the dismissal of this claim. However, I do not reach the categorical decision of Judge Boggs that disapproval of Stemler's perceived sexual orientation was the sole, or even a significant, basis for her arrest by the defendants, and that this action therefore violated the equal protection clause.
 
 
 88
 The district court, upon remand, must also determine the effect, if any, on the federal claims asserted in this case of any future decision of the Kentucky Court of Appeals concerning the individual claims of Stemler and on behalf of Black. There is also the question whether plaintiffs impermissibly split their causes of action in these cases. They could have filed the § 1983 actions in state court. See Kabealo v. Davis, 829 F.Supp. 923, 928 (S.D.Ohio 1993) (splitting state claims from federal claims "would result in a needless duplication of expense and judicial resources"); Administaff, Inc. v. Kaster, 799 F.Supp. 685, 690 (W.D.Tex.1992) ("Federal and state claims 'inexorably tied together' are best left together").
 
 
 89
 I would affirm the decision of the district court as to the municipal defendants, and as to defendants in their official capacities. I would affirm dismissal of Stemler's claims of false arrest, malicious prosecution, and evidence falsification. I would REVERSE and REMAND for further proceedings and consideration of alleged federal constitutional torts in light of the decision set out herein, and in light of the Kentucky appellate decision on the remaining claims.[2]
 
 ORDER
 Nov. 13, 1997
 
 90
 Upon consideration of the petition for rehearing filed by the appellees,
 
 
 91
 It is ORDERED that the petition for rehearing be, and it hereby is, DENIED.
 
 
 92
 Judge Wellford would adhere to his separate opinion and would augment it as attached.
 
 
 93
 HARRY W. WELLFORD, Circuit Judge, would adhere to his separate opinion. I would augment it by adding that defendant officers had a clear duty under the circumstances not to place the victim Black in harm's way by placing her in Kritis' vehicle while she was obviously severely intoxicated. Such defendants "must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exist[ed], and [they] must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Under the circumstances at the time, a special relationship existed between the officers and Black which extended the chain of causative events.
 
 
 
 [1]
 The procedural postures of these cases are somewhat odd, since in both cases we are presented with an appeal from a dismissal under Rule 12(b)(6) with respect to some defendants and an appeal from summary judgment with respect to other defendants. Except where otherwise noted, this opinion will discuss the record evidence viewed in the light most favorable to the appellants
 
 
 [2]
 Stemler denies that she is a lesbian
 
 
 [3]
 Both Black's complaint and Stemler's complaint allege that Kritis's blood alcohol level at the time of the police stop was .20
 
 
 [4]
 Stemler's complaint alleges that she had a blood alcohol level below .10 at the time of the police stop
 
 
 [5]
 In her complaint, Stemler alleges that Wince used excessive force in handcuffing her. The district court denied Wince's motion to dismiss this claim; however, Stemler has voluntarily dismissed her excessive force claim
 
 
 [6]
 Black's complaint alleges that, "having lost the assistance of Susan Stemler, under threat of arrest and against her will," she capitulated and allowed herself to be placed into Kritis's truck. Dolan testified that Black asked if she could leave with Kritis; however, Black's estate argues that Dolan had an incentive to be untruthful on this point, and that the issue of his veracity should be reserved for the factfinder. Given the officers' admissions that Dusing ordered Dolan to threaten Black with arrest, and Black's earlier unwillingness to leave with Kritis, a view of the evidence most favorable to Black would indicate that she involuntarily left the scene of the police stop with Kritis
 
 
 [7]
 Kritis would subsequently plead guilty in the Boone County District Court to manslaughter in the second degree and to wanton endangerment in the first degree. He was sentenced only to probation. After violating the terms of his probation, he is now serving a five-year prison sentence
 
 
 [8]
 The appellees have informed the court that Kenner died on May 11, 1997. The appellees should have informed the court at the same time of the identity of Kenner's successor. See FED. R.APP. P. 43(c). Since Black sued Kenner only in his official capacity as Boone County sheriff, for the purposes of this appeal we will treat the claims against him and the other Boone County defendants in their official capacities as a suit directly against Boone County
 
 
 [9]
 During the course of discovery, Stemler was denied access to the defendants' personnel files. Instead, the magistrate judge conducted an in camera review of those files and determined that they did not contain relevant evidence. Stemler now claims that the magistrate judge erred and that the files may contain evidence of other incidents to which the City of Florence failed to respond. However, she has waived this claim by failing to appeal the magistrate judge's ruling to district court. See FED. R. CIV. P. 72(a)
 
 
 [10]
 In contrast to procedural due process, which guarantees that individuals will be afforded fair procedures before they are deprived of life, liberty, or property, substantive due process protects individuals against "certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). But cf. JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 18 (1980) (suggesting that non-textual constitutional claims would be better analyzed under the Privileges and Immunities Clause of the Fourteenth Amendment; "Familiarity breeds inattention; and we apparently need periodic reminding that 'substantive due process' is a contradiction in terms--sort of like 'green pastel redness.' ")
 
 
 [11]
 An instructive parallel: the district court's theory is analogous to an attempt to strike down a statute as unconstitutionally vague on its face because the application of the statute is not clear at the margins. Such an attempt will be unavailing, since federal courts will consider a facial vagueness claim only if a statute is unconstitutionally vague in all possible applications. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95, 102 S.Ct. 1186, 1191-92, 71 L.Ed.2d 362 (1982). Similarly, the mere fact that a state actor may be entitled to qualified immunity on some claims under a particular constitutional theory because the law is unclear in some respects does not imply that he will be immune from any and all suits arising under that theory
 
 
 [12]
 The defendants have argued that Black is precluded from relitigating the findings of the Boone County Circuit Court in her state-law civil suit. In awarding judgment to the defendant officers on Black's wrongful death claim, the state court held that none of the state actors were the direct cause of the accident on the highway. Chipman v. City of Florence, No. 94-CI-00202 slip op. at 4 (Boone Co., Ky., Cir. Ct. Apr. 2, 1996). While those findings are entitled to preclusive effect, they are irrelevant to the merits of her substantive due process claim
 
 
 [13]
 Stemler argues, without elaboration, that she did not receive a fair hearing in the state court in her state-law civil suit. However, a state court proceeding is accorded preclusive effect in a later § 1983 suit so long as it meets minimal standards of due process. See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982); Osborn v. Ashland Bd. of Alcohol, Drug Addiction & Mental Health Servs., 979 F.2d 1131, 1134 (6th Cir.1992). Stemler does not identify any reason to believe that she suffered a deprivation of due process in the state court
 
 
 [14]
 Because we affirm the dismissal of the false arrest claim on the ground of collateral estoppel, we do not address the reasoning of the district court, based on Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), that the right to be free from false arrest is not clearly established. On remand, if in the interim Stemler should secure a reversal on appeal of the judgment against her in her state-law suit, thereby destroying the collateral estoppel effect of that judgment, the district court should consider in the first instance whether Stemler's claim may proceed under the standard of qualified immunity that we have set out in this opinion
 
 
 [15]
 We need not discuss whether any other aspect of Romer 's holding is sufficiently new that a state actor could not be expected to anticipate it. The core principle relevant in this case, that the state may not act solely out of the desire to harm an unpopular group, was clearly established by the case law in 1994
 
 
 [1]
 I believe Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), simply holds that a statute purporting to deprive homosexuals of any special protections under state law has no rational relation to legitimate state government purposes. Furthermore, Romer was decided long after these defendants acted in this case
 
 
 [2]
 I also note the death of the Boone County Sheriff