**Carol SOLES, Personal Representative of the Estate of Aaron Frayer, Deceased, Plaintiff,**

v.

**INGHAM COUNTY, Clinton–Eaton–Ingham Community Mental Health, Elizabeth Mitchell, Judith Cates, and Deputy John Haven, Defendants.**

No. 1:02–CV–423.

United States District Court, W.D. Michigan, Southern Division.

March 29, 2004.

Geoffrey N. Fieger, Paul W. Broschay, Tammy J. Reiss, Fieger, Fieger, Kenney & Johnson, Southfield, MI, for Plaintiff.

Ruth E. Mason, Cohl, Stoker, Toskey & McGlinchey, P.C., Jason D. Kolkema, Patrick Aseltyne, Johnson, Rosati, LaBarge, Aseltyne & Field, Lansing, MI, for Defendants.

## OPINION OF THE COURT

MCKEAGUE, District Judge.

On April 29, 2000, sixteen-year old Aaron Frayer committed suicide while incarcerated at the Ingham County Jail in Mason, Michigan. In this action, Carol Soles, Aaron's grandmother and personal representative of his estate, sues various persons and entities who were responsible for his care and welfare while incarcerated. In a three-count complaint, plaintiff alleges Aaron's death was caused by defendants' deliberate indifference, gross negligence and negligence. Now before the Court are defendants' motions for summary judgment. Having duly considered the mo-

tions and plaintiff's opposition, the Court finds there is no genuine issue of material fact. For the reasons that follow, defendants' motions for summary judgment will be granted.

## I

Aaron Frayer was arrested on February 23, 2000 and lodged at the Ingham County Jail, charged as an adult with eight counts of first degree criminal sexual conduct. On April 11, 2000, he pleaded guilty to three counts of criminal sexual conduct with his six-year old step-brother. He remained in jail pending sentencing.

Since his arrest, Aaron had been manifestly depressed and suicidal. Although he was originally placed in a close custody general population area reserved for juvenile offenders, on March 17, 2000, he was moved to an observation cell after reporting suicidal thoughts to a corrections officer. Later that same day, Aaron's mother advised the jail administration that she and her mother, Carol Soles, had received letters from Aaron indicating he would attempt suicide on March 17th.

Aaron's mental condition was immediately evaluated by defendant Elizabeth Mitchell, M.S.W., a mental health worker in the Correctional Assessment and Treatment Services ("CATS") Program operated at the jail by defendant Clinton–Eaton–Ingham Community Mental Health ("CEI–CMH"). Aaron told Mitchell that he had taken an overdose of a medication called Desyrel two days earlier. Though the reported overdose remained otherwise unsubstantiated, Mitchell arranged for Aaron's immediate transfer to the psychiatric unit at St. Lawrence Hospital in Lansing, after consulting with her supervisor, CATS medical director Judith Cates, psychiatrist Donald Williams, M.D. and jail nurse Krista Buckland, R.N.

Aaron was discharged from St. Lawrence one week later. He still reported feeling depressed, but was observed to be "remarkably brighter." His discharge diagnosis:

Adjustment Disorder, with Depressed Mood

Post–Traumatic Stress Disorder

Conduct Disorder

Discharge Summary, Dale A. D'Mello, M.D., March 24, 2000. Aaron's recommended treatment plan included medications (Prozac and Depakote) and individual, group and activity therapy.

On return to the Ingham County Jail, Aaron was placed in an observation cell again. Mitchell met with him there on March 29th, March 31st, and April 3rd. Aaron continued to express suicidal thoughts, but showed gradual improvement. On April 6, 2000, Aaron was temporarily placed in a restraint chair because he had been beating his head and arms on the wall of the observation cell. He was returned to his cell after agreeing not to harm himself.

On April 24, 2000, Mitchell noted significant improvement in Aaron's mood and attitude. Aaron seemed less agitated and told her he had not experienced suicidal thoughts for at least a week. Aaron signed a "no-harm contract," agreeing not to harm himself or others and to notify a deputy if he felt he was going to harm himself or others. Mitchell made inquiry of corrections officers, who reported that Aaron had been less withdrawn and was interacting more normally with others. Mitchell consulted with Judith Cates, who concurred in the decision to return Aaron

to general population, which occurred on April 26, 2000.

Aaron was interviewed by his probation officer Lori Gross on Friday, April 28, 2000, as she prepared Aaron's presentence investigation report. Their conversation included discussion of Aaron's potential sentence. Gross met with Mitchell afterward and remarked that Aaron was aware of his potential sentence and "appeared to be coping with the situation." Mitchell Progress Note, May 1, 2000.[1]

Mitchell intended to meet with Aaron the following Monday, May 1st. At 12:55 a.m. on Saturday, April 29th, however, Aaron was found hanging in his cell from a bed sheet tied around his neck. He was dead. Defendant Deputy John Haven, the deputy in charge that night, reported having observed Aaron laughing and joking around 10:30 p.m., asleep on his bunk at 11:00 p.m., and walking around his cell at midnight. Knowing that Aaron had previously been in an observation cell, Haven said he had had a "gut hunch" that he might try to commit suicide some time in the night. He did not request that Aaron be returned to an observation cell, however, because his hunch was not supported by any evidence.

In count I of her complaint, plaintiff alleges that all remaining defendants, Ingham County, CEI–CMH, Mitchell, Cates and Haven are liable under 42 U.S.C. § 1983 for having, under color of state law, deprived Aaron of his federally protected civil rights. More specifically, defendants are alleged to have taken Aaron's life without due process through their deliberate indifference to his serious medical and psychological needs. In count II, plaintiff al-

---

**1.** Plaintiff notes that Gross reported observing a "strange look" on Aaron's face as the interview concluded. Incident Investigation Report, May 9, 2000, p. 8. Plaintiff argues that Gross also reported this strange look to Mitchell on April 28th, but this suggestion is expressly denied by Mitchell in her affidavit of June 3, 2003 and otherwise finds no support in the record.

leges, under state law, that defendants Mitchell, Cates and Haven caused Aaron's death by their gross negligence. In count III, Ingham County is alleged to be liable for Aaron's death under state law because of its negligence in failing to design and construct a safe facility equipped with adequate monitoring equipment.

Defendants have moved for summary judgment, contending there is no genuine issue of material fact on any of plaintiff's claims and that they are entitled to judgment as a matter of law.

## II

Defendants' motions require the Court to look beyond the pleadings and evaluate the facts to determine whether there is a genuine issue of material fact that warrants a trial. Fed.R.Civ.P. 56(c). *See generally, Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). That is, the Court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party identifies elements of a claim or defense which it believes are not supported by evidence, the nonmovant must present affirmative evidence tending to show a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Id.* at 252, 106 S.Ct. 2505. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The substantive law identifies which facts are "material." Facts are "material" only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A complete failure of proof concerning an essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## III

### A. § 1983 Claims Against Individual Defendants

Where jail officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment. *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir.2001). Pretrial detainees are analogously protected from such mistreatment under the Due Process Clause of the Fourteenth Amendment. *Id.* Psychological needs manifesting themselves in suicidal tendencies are serious medical needs. *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994). Yet, there is no general right of prisoners or detainees to be correctly screened for suicidal tendencies or to be protected against committing suicide. *Davis v. Fentress County*, 6 Fed.Appx. 243, 249, 2001 WL 223625 (6th Cir.2001). Hence, to prevail on her § 1983 claims, plaintiff must prove that Aaron demonstrated a strong likelihood of taking his

own life and that defendants acted with deliberate indifference to that threat. *Id.*

 "Deliberate indifference" describes a state of mind more blameworthy than negligence; it requires the showing of a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Napier,* 238 F.3d at 742. To establish that defendants acted with deliberate indifference, plaintiff must show that they both knew of and disregarded an excessive risk of harm; that they were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they actually draw the inference, but consciously disregarded it. *Farmer,* 511 U.S. at 837–39, 114 S.Ct. 1970. If defendants are shown merely to have failed to act in the face of an obvious risk of which they should have known but did not, they were not "deliberately indifferent." *Id.; Davis,* 6 Fed.Appx. at 250.

Plaintiff acknowledges that defendant Mitchell responded appropriately to the manifest risk of Aaron's suicide until April 24, 2000. When Mitchell recommended that Aaron be placed in general population, she is said to have consciously disregarded the continuing risk of suicide. Defendant Cates is said to be liable for approving the recommendation. Plaintiff contends Mitchell and Cates placed too much weight on the no-harm contract and ought to have afforded medical treatment or therapy to Aaron before returning him to general population. In support, plaintiff cites the affidavit of W. Ken Katsaris, a Florida law enforcement officer, instructor and consultant; and the letter opinion of board certified psychiatrist Gerald A. Shiener, M.D. Both putative experts opined that use of the no-harm contract under the circumstances was unreliable and inappropriate. Both also opined that Aaron's return to general population reflected deliberate indifference by defendants to the manifest and continuing risk of suicide.

First of all, the putative experts' opinions on the ultimate issue of deliberate indifference are expressions of a legal conclusion and are outside the scope of admissible expert testimony. *Berry v. City of Detroit,* 25 F.3d 1342, 1353–54 (6th Cir. 1994). Second, their opinions regarding the use of no-harm contracts have little probative value because they do not even address the question whether Mitchell and Cates knew of and consciously disregarded an excessive risk of harm.

In terms of what Mitchell and Cates knew, the record discloses that they were well-aware of Aaron's history of depression and suicide threats since being lodged at the jail. When there was reason to believe there was a strong likelihood of suicide on March 17th, they responded decisively and secured Aaron's immediate transfer to the psychiatric unit of a local hospital. Upon his return to the jail, Mitchell, in particular, monitored Aaron's progress in response to prescribed anti-depressant medications. When Mitchell and Cates made the decision to return Aaron to general population on April 24th, they did not forget or ignore Aaron's history.

Mitchell explained that the no-harm contract was one tool she used in assessing Aaron's ability to resist the impulse to hurt himself. Mitchell dep. p. 29. The written commitment to a plan, she explained, is deemed to be a help to the client in dealing with anxiety and self-destructive feelings. *Id.* In addition, she relied on her observations and reports of deputies that Aaron's affect was brighter; that he was less agitated, less withdrawn, interacting more with others, and eating and sleeping better. *Id.* at 30, 38–39. Mitchell noted that Aaron had stated that his suicidal thoughts had ceased at least a week prior to April 24th. *Id.* at 52. She believed the medi-

cations prescribed a month earlier during Aaron's hospitalization had reached a therapeutic level and were contributing to his improvement. *Id.* at 43. Aaron had already spent 30 days, an unusually long period of time isolated in the observation cell. Cates dep. p. 62. Once Aaron's compliance with the prescribed medication regimen yielded improvement, it was believed that return to general population, where Aaron could associate more freely with others, would bring more progress. *Id.* at 64.

After the recommendation to return Aaron to close custody general population was made, Mitchell spoke routinely with the deputies about Aaron's transition. Mitchell aff. ¶ 6. Yet, she received no report of any change in Aaron's behavior, no report of statements by Aaron about suicidal thoughts or intentions. *Id.,* ¶¶ 7, 8. Mitchell spoke with Gross on April 28th about Aaron's demeanor during the presentence investigation interview, but expressly denies that Gross told her of the "strange look" she observed on Aaron's face as the interview ended. *Id.* at ¶¶ 9, 10. She understood Gross to have observed that Aaron "appeared to be coping with the situation." Progress Note, May 1, 2002.[2]

■ The above evidence of defendants Mitchell's and Cates' state of mind is essentially unrefuted. The record clearly does not support a finding that they acted with a "sufficiently culpable state of mind" to be deemed to have been deliberately indifferent to Aaron's serious psychological needs. To the contrary, their decision to return Aaron to general population, though ill-fated, was undeniably motivated by concern for his welfare, not conscious disregard for a known risk of harm.

There is absolutely no evidence that either Mitchell or Cates had knowledge of any circumstances occurring after April 24th, such as a change in Aaron's behavior, attitude or demeanor, from which they can be expected to have inferred that there was a strong likelihood he would take his own life.

No reasonable jury could find in favor of plaintiff on her § 1983 claims against defendants Mitchell and Cates. They are entitled to summary judgment on the claims asserted against them in count I.

The factual support for plaintiff's § 1983 claim against defendant Haven is even weaker. Plaintiff contends Haven's failure to act on his "hunch" that Aaron might try to commit suicide constitutes deliberate indifference. Not surprisingly, plaintiff has cited no authority for such a theory. To establish deliberate indifference, plaintiff must show both that Haven was "aware of *facts* from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that Haven actually drew the inference. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970; *Davis,* 6 Fed.Appx. at 249–50.

Until April 26th, when Aaron was placed in general population, Haven was clearly entitled to rely on the CATS personnel's assessment of Aaron's suicide risk and on their conclusion that he had improved to the point of being fit for release from the observation cell. Between April 26th and the time of Aaron's death, when Haven's observations of Aaron's behavior and demeanor became material, the record discloses no *facts* of which Haven was aware and from which he drew the inference that the likelihood of suicide had become stronger or more substantial. Haven ad-

---

**2.** Indeed, two deputies who had occasion to observe Aaron after his meeting with Gross reported that he "seemed ok and was acting normal," and "there was no evidence that he was going to commit suicide." Charmane Hawkins aff. ¶ 3; Haven dep. pp. 80, 86–87.

mitted that he had a hunch, a feeling, a concern about Aaron. Despite repeated questioning, however, he was unable to identify any evidence, any facts, to substantiate his hunch. Haven dep. pp. 78–81, 85–88. Nor has any such evidence been adduced from any other source. Haven admitted that he had had suicide hunches before, but no other hunch had come true. *Id.* at 86.

This record does not amount even to a "mere scintilla of evidence" that Haven was deliberately indifferent to Aaron's serious psychological needs. Plaintiff has failed to demonstrate the existence of a triable fact issue on this essential element of her § 1983 claim against defendant Haven. He, too, is therefore entitled to summary judgment on this claim.

### B. § 1983 Claim Against the County and CEI–CMH

Plaintiff's response to defendants' motions for summary judgment discloses that her § 1983 claims against the local governmental entities are based on the charge that Aaron's death was caused by his placement in general population pursuant to an official policy or custom improperly permitting the use of no-harm contracts in a correctional setting. In support, plaintiff relies on the opinion of W. Ken Katsaris:

> Contracts of this nature are not recognized as a valid tool by the American Correctional Association. At best they are controversial when the risk is low and the psychiatric history is not indicative of repeated attempts to commit suicide. Frayer had been diagnosed as "impulsive," even "explosive" with poor judgment. And, he was a juvenile incapable of recognizing or appreciating the meaning of such an agreement.

Katsaris aff. p. 5.

To impose § 1983 liability on a municipality or local governmental entity, plaintiff must show that an officially executed policy, or the toleration of a custom, resulted in a constitutional deprivation. *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir.1996). *Respondeat superior* liability is not available under § 1983. *Id.*

Here, plaintiff has not adduced any evidence that Mitchell and Cates, in their use of the no-harm contract, acted pursuant to the affirmative requirements of any officially executed policy—either of the County or of CEI–CMH. Rather, plaintiff impliedly contends that defendants' failure to prohibit or restrict the use of no-harm contracts in the jail setting represents a custom or policy of inaction or deliberate indifference.

"Deliberate indifference," in this context, is a stringent standard of fault, requiring proof that a governmental entity disregarded a known or obvious consequence of its action. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir.1997); *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). A showing of simple or even heightened negligence will not suffice. *Stemler*, 126 F.3d at 865. A local governmental entity can be held liable under § 1983 for the actions of its employee only if the risk of a constitutional violation arising as a result of inadequacies in a policy was "plainly obvious." *Id.*, quoting *Brown*, 520 U.S. at 414, 117 S.Ct. 1382. "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond." *Stemler*, at 865.

Here, to prevail on her § 1983 claims against the County and CEI–CMH, plaintiff must establish (1) the existence of a clear and persistent pattern of misuse of

no-harm contracts with at-risk inmates; (2) notice or constructive notice on the part of the County and CEI–CMH; (3) defendants' tacit approval of the misconduct such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that defendants' custom or policy of inaction was the "moving force" or direct causal link in the constitutional deprivation. *See Doe v. Claiborne County*, 103 F.3d at 508. In other words, the evidence must show that the need to act was so obvious that the defendants' "conscious" decision not to act can be said to amount to a "policy" of deliberate indifference to inmates' constitutional rights. *Id.*

■ The present record fails to satisfy the above requirements in several respects. There is no evidence of any history of misuse of no-harm contracts in the Ingham County Jail. There is no evidence that defendants Ingham County or CEI–CMH had notice of a "plainly obvious" need to implement an improved policy or improve training of personnel in the appropriate use of no-harm contracts. The evidence does not, therefore, support the finding that defendants had a "policy" of inaction or deliberate indifference. Nor is there evidence that any such policy was the moving force behind Aaron's death. The undisputed testimony of both Mitchell and Cates establishes that Aaron's willingness to sign the no-harm contract was merely one among numerous factors that contributed to their decision to return him to general population. The use of the no-harm contract was not the moving force behind the decision. Hence, it necessarily follows that the County's and CEI–CMH's

failure to circumscribe the use of no-harm contracts in the jail was not the "moving force."

Based on the present record, no reasonable jury could find that the need for corrective action was so obvious that defendants' conscious decision not to restrict the use of no-harm contracts amounted to a policy of indifference to inmates' constitutional rights. There is no genuine issue of material fact; the County and CEI–CMH are also entitled to summary judgment on plaintiff's count I § 1983 claims against them.[3]

## IV

In count II of her complaint, plaintiff asserts state law claims against the individual defendants, alleging Mitchell, Cates and Haven were grossly negligent. These claims are designed to come within an exception to the statutorily prescribed governmental immunity to which the individual defendants would otherwise be entitled. Under M.C.L. § 691.1407(2)(c), a governmental employee whose conduct amounts to gross negligence which is the proximate cause of injury is not immune from tort liability. "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.*

This definition of gross negligence under Michigan law establishes a standard materially indistinguishable, as applied to the facts of this case, from the deliberate indifference standard discussed above in connection with plaintiff's § 1983 claims. *See Farmer*, 511 U.S. at 836–38, 114 S.Ct. 1970

---

**3.** Moreover, inasmuch as the above analysis demonstrates that the conduct of the individual defendants did not result in the deprivation of any constitutional right, the County and CEI–CMH cannot, as a matter of law, be liable under § 1983. *See Weeks v. Portage*

*County Executive Offices*, 235 F.3d 275, 279 (6th Cir.2000) (observing that the deprivation of a constitutional right is a threshold prerequisite to municipal liability under § 1983); *Napier*, 238 F.3d at 743 (same).

(discussing relationship between recklessness and deliberate indifference). For the same reasons plaintiff is found above not to have established deliberate indifference on the part of the individual defendants, the Court also finds that she has failed to adduce facts upon which a reasonable jury could find that any of the individual defendants was grossly negligent or reckless in their treatment of Aaron.

 Moreover, liability may be imposed for gross negligence only where it is *the* proximate cause of injury, i.e., "the one most immediate, efficient, and direct cause preceding injury." *Robinson v. City of Detroit*, 462 Mich. 439, 458–59, 613 N.W.2d 307(2000). Thus, even if Mitchell, Cates or Haven were deemed responsible for some nonfeasance amounting to gross negligence, liability could be imposed only if such nonfeasance was the proximate cause of Aaron's death. Yet, it is undisputed that Aaron committed suicide while he was alone in his cell by hanging himself with a bed sheet. The one most immediate, efficient and direct cause of his death was clearly not any nonfeasance by defendants, but Aaron's own volitional self-destructive act. *See Scott v. Charter Twp. of Clinton,* 2002 WL 31160298 (Mich.App. Sept. 27, 2002).

For the above reasons, the Court concludes plaintiff has failed to present facts in avoidance of governmental immunity sufficient even to create a triable fact issue. The individual defendants are entitled to summary judgment on plaintiffs' count II claims against them.

# V

 Finally, count III asserts a state law negligence claim against defendant Ingham County for its failure "to design and construct its buildings in a reasonably safe manner so as to avoid unnecessary injuries and death. This claim is designed to come within the public building exception to governmental immunity under M.C.L. § 691.1406." The County contends that plaintiff, personal representative of the estate of an inmate, seeking recovery for injuries sustained by him allegedly because of a building defect, cannot as a matter of law invoke the public building exception. In support, the County cites *Brown v. Genesee County Bd. of Comm'rs,* 464 Mich. 430, 628 N.W.2d 471 (2001); *Bobbitt v. Detroit Edison Co.,* 216 F.Supp.2d 669 (E.D.Mich.2002). *See also Scott,* 2002 WL 31160298 at *1–2. These cases establish that, indeed, a jail inmate is not a member of the public for purposes of the public building exception.

Plaintiff has not responded to the County's motion in this regard and has presumably abandoned her count III claim against the County. Accordingly, for the reasons argued by the County and because plaintiff has not, in any event, adduced evidence to support the finding that Aaron's death was the result of a dangerous or defective condition of the jail building, summary judgment will be awarded to the County on count III as well.

# VI

For the reasons set forth above, the motions for summary judgment of defendants Ingham County, Clinton–Eaton–Ingham Community Mental Health, Elizabeth Mitchell, Judith Cates and Deputy John Haven will be granted in their entirety. Judgment will be awarded in favor of these defendants on all remaining claims.[4]

**4.** The claims asserted against other named defendants were dismissed by order dated

August 29, 2003.

A judgment order consistent with this opinion shall issue forthwith.